## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| ROY LOVIN, | CASE NO. 1:20-CV-02330-DAR |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Roy Lovin filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 14, 2020, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me on May 21, 2021 pursuant to General Order 2021-06. (Non-document entries of October 14, 2020 and May 21, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Mr. Lovin filed for DIB on August 25, 2017, alleging a disability onset date of July 7, 2017. (Tr. 96-97). His claims were denied initially and on reconsideration. (Tr. 110-11, 126). He then

requested a hearing before an Administrative Law Judge. (Tr. 147-48). Mr. Lovin (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on October 15, 2019. (Tr. 48-95). On November 1, 2019, the ALJ issued a written decision finding Mr. Lovin not disabled. (Tr. 10-21). On August 18, 2020, the Appeals Council denied Mr. Lovin's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-5; *see* 20 C.F.R. §§ 404.955, 404.981). Mr. Lovin timely filed this action on October 13, 2020. (ECF #1).

FACTUAL BACKGROUND

## I.    ADMINISTRATIVE HEARING

The following summarizes the proceedings before the ALJ, including the testimony of Mr. Lovin and VE George Coleman, III.

Mr. Lovin's counsel presented an opening statement. In it, counsel noted that Mr. Lovin was first diagnosed with multiple sclerosis (MS) in 2012 and continued to "work through it" until July of 2017, when he finally lost his job for missing work due to his health problems. (Tr. 55). Mr. Lovin had five excused and five unexcused absences resulting from MS symptoms and was let go from work. (*Id.*). He had not informed his employer that he had been diagnosed with MS. (Tr. 56). During that period, Mr. Lovin had received inconsistent treatment for his MS, due to his physician's retirement. (*Id.*). Mr. Lovin was using marijuana to control his symptoms of dizziness and nausea. (*Id.*). Mr. Lovin then failed a drug test at work due to his marijuana use, but successfully completed a month-long rehab program. (*Id.*). Mr. Lovin was let go two months thereafter. (*Id.*).

Mr. Lovin was able to reestablish care for his MS with the Cleveland Clinic Mellen Center, but his condition had significantly declined. (Tr. 56, 58). An MRI from November 2018 indicated

2

MS progression. (Tr. 59). Mr. Lovin's physical therapy evaluation indicated he required a cane; he used walls and furniture to aid in walking around his house; but Mr. Lovin's treating provider did not indicate Mr. Lovin required a cane. (*Id.*). Mr. Lovin had initially been hesitant to begin an infusion treatment due to the significant risks involved in the treatment, Mr. Lovin had stopped his MS medication Tecfidera so that he could start on a new infusion[1] treatment. (Tr. 59-60).

In addition to his MS, Mr. Lovin has mental health diagnoses, for which he has received regular treatment. (Tr. 58). A psychological evaluation in 2018 indicated significant problems in thinking and comprehension. (Tr. 59).

Mr. Lovin then testified. He told the ALJ that he experiences significant memory issues. (Tr. 61). If he attempted to read a passage, he would forget its contents after a paragraph or two. (*Id.*). This had been going on for about 12 to 18 months at the time of the hearing. (*Id.*).

Mr. Lovin complains of back and leg pain, and numbness in his hands. (Tr. 64). He "constantly" drops things due to the numbness, and points to age sixteen as when he first began experiencing these issues (when he was as-yet undiagnosed with MS). (*Id.*). Mr. Lovin testified he was able to drive, but that it was stressful and traumatic for him. (Tr. 62-63). He would only travel two to three miles to pick up his son, every other day and every other weekend. (Tr. 63). Mr. Lovin helps his son with homework, prepares meals, and cleans, but finds these tasks difficult. (Tr. 63-64). He is unable to play video games with his son due to hand pain, numbness, and tingling, and problems using his fingers to manipulate the controls. (Tr. 72-73).

---

[1]     Mr. Lovin's attorney referred to the treatment as an "injection." However, it is apparent from the record that Mr. Lovin's provider recommended immunotherapy treatment by infusion. (*See, e.g.*, Tr. 817-18).

Mr. Lovin worked in an incentive shop—the more he made, the more he was paid. (*Id.*). He was the longest-tenured employee at the shop and consistently hit high production records due to his experience. (*Id.*). But after his diagnosis, Mr. Lovin would work himself too hard and overheat. (*Id.*). When questioned by the ALJ about his ability to work despite hand numbness, Mr. Lovin explained he did so "[b]ecause I had to. How am I going to eat if I don't have no income? How am I going to pay child support? I had to." (Tr. 64-65). Although Mr. Lovin was aware of the limitations his MS diagnosis caused, he "pushed through" his symptoms because he knew he "wasn't going to be able to do it forever." (Tr. 66).

He explained that at work he was sick, throwing up due to dizziness, had leg weakness, and was falling. (Tr. 65). Mr. Lovin uses marijuana to control dizziness, vertigo, nausea, and anxiety; but after work-sponsored rehab, he "got clean and got sicker from the MS." (Tr. 65, 69). He then lost his job because he had used up his medical and vacation leave, and was not permitted absences in the 90 days after rehab. (Tr. 65, 70).

Mr. Lovin has good days and bad days. (Tr. 75). He was having a good day on the day of the functional test at the Mellen Center. (Tr. 74-75). About half the days of the week are bad days. (Tr. 77). On these days, he feels sick, has migraines, and lacks the energy to get out of bed. (*Id.*).

Mr. Lovin testified he could stand for 15 minutes before needing to rest, and could lift and carry 20 pounds for the same amount of time. (Tr. 76). When he was first diagnosed with MS in 2012, he required a wheeled walker for ambulation; he had attempted to use two canes but was unable to use them due to a lack of coordination between his arms and feet. (Tr. 78-79). Mr. Lovin experiences discoordination between his hands and legs; he will drop items he is carrying, and fell

4

down the stairs three days prior to the hearing. (Tr. 79). Mr. Lovin explained that was the first fall

he had in about a year, but he still often feels off-balance and as if he is about to fall. (Tr. 79-80).

Mr. Lovin describes his mental health as "poor." (Tr. 81). He treats with Signature Health

and is on antidepressants. (*Id.*). Even so, he experiences emotional turmoil, breakdowns, and daily

crying spells. (*Id.*). His doctors increased his medication dosage, but Mr. Lovin described the

medication as beneficial only on 60 to 70 percent of the days. (Tr. 82).

Mr. Lovin's MS is progressing as confirmed in his most recent MRI (taken about nine

months prior to the hearing). (Tr. 82-83). He has open lesions on his brain and significant

scarring. (*Id.*). His MS medication was not working, and he was not receiving treatment for the

disease progression. (Tr. 83). Mr. Lovin testified his MS was "mild" at first, is currently

"moderate," and at the next stage in his disease progression, he would likely be in a wheelchair.

(*Id.*). Mr. Lovin indicated he was preparing for infusion treatments and would have another MRI

at the Mellen Center prior to starting those treatments. (Tr. 83-84).

VE Coleman then testified. He VE identified Mr. Lovin's past work as a combined

position of automotive assembler, DOT[2] 806.684-010, SVP[3] 2, unskilled, medium strength but

very heavy as performed and rubber goods inspector/tester, DOT 759.684-074, SVP 4, semi-

skilled, light strength but heavy as performed (due to the requirement of lifting 100 pounds

occasionally and 70 pounds frequently). (Tr. 85).

---

[2]    "DOT" refers to the *Dictionary of Occupational Titles*, published by the Department of Labor. 20 C.F.R. § 404.1566(d).

[3]    "SVP" stands for "Specific Vocational Preparation" and refers to the amount of time a typical worker requires to learn the techniques, acquire the information, and develop the facility needed for average performance of a job. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 851 n.6 (6th Cir. 2010).

The ALJ asked the VE to consider a hypothetical individual who is 39, soon to be 40; has a twelfth-grade education; can read, write, and perform arithmetic; and has the combination job previously testified. (Tr. 86). The ALJ limited the individual to light exertional work with the following additional non-exertional limitations:

- No climbing of ladders, ropes, or scaffolds;

- Occasional climbing of ramps and stairs;

- Occasional balancing, stooping, kneeling, crouching, and crawling;

- No concentrated exposure to temperature extremes, humidity;

- Performance of routine tasks in a low-stress environment, no fast pace, quotas, or frequent duty changes; and

- Only superficial interpersonal interactions, with no arbitration, negotiation, or confrontation.

(Tr. 86). The VE testified such an individual could not perform past work with the restrictions in the first hypothetical. (*Id.*). The VE identified representative examples of jobs at both light and sedentary exertional levels, as follows:

Light exertional level:

- Office helper/clerical assistant (DOT 239.567-010): SVP 2, unskilled, light, 83,250 jobs in the national economy;

- Storage facility rental clerk (DOT 295.367-026): SVP 2, unskilled, light, 75,910 jobs in the national economy; and

- Mail room clerk (209.687-026): SVP 2, unskilled, light, 24,770 jobs in the national economy;

Sedentary exertional level:

- Addresser/address clerk (DOT 209.587-010): SVP 2, unskilled, sedentary, 22,500 jobs in the national economy;

- Document preparer (DOT 249.587-018): SVP 2, unskilled, sedentary, 145,910 jobs in the national economy; and

- Surveillance-system monitor (DOT 379.367-010): SVP 2, unskilled, sedentary, 39,470 jobs in the national economy.

(Tr. 87-89).

For the second hypothetical, the ALJ presented an individual with the same limitations as in the first hypothetical, but with the additional limitation of being off-task at least 20 percent of the time due to symptoms of medically determinable impairments. (Tr. 89). The VE testified the individual would be precluded from competitive work. (Tr. 89). Based on his experience in the labor market, employers only tolerate 10 to 12 percent off-task behavior outside of scheduled breaks and lunch periods. (*Id.*). After that, an employer will update the employee's personnel file with warnings, written reprimands, and eventual discharge. (*Id.*). In addition, an employer would only tolerate a half-day to a day per month of acceptable absenteeism, including arriving 15 minutes late or leaving 15 minutes early. (Tr. 90). The VE testified that an employee would not be permitted to miss work at all during a probationary period; all unskilled, competitive work opportunities include a 30-day probationary period. (*Id.*).

All the identified jobs included occasional interaction with supervisors and coworkers. (Tr. 91). If the hypothetical individual were limited to no work-related interaction with the public and no work in a public setting, then the storage facility rental clerk position would be eliminated. (Tr. 91-92). All other jobs would remain, and the VE testified he could find another DOT job available within the additional limitation. (Tr. 92).

The VE testified the identified jobs would remain if the person were limited in their ability to stay on their feet for no more than four hours total in a day, and in no more than 30-minute increments. (*Id.*). The VE testified that a limitation of four of eight hours standing and walking was consistent with light work, but would either require accommodation at a light exertional level or

7

limitation to sedentary work if the individual required less time for standing and walking. (Tr. 92-93). It would be less than sedentary work if the individual could not lift even ten pounds occasionally. (Tr. 93).

## II.   PERSONAL AND VOCATIONAL EVIDENCE

Mr. Lovin was 37 years old at the time of his alleged onset date, and 39 years old at the time of the administrative hearing. (Tr. 19). Mr. Lovin completed the twelfth grade and has a high school diploma. (*Id.*). In the past, Mr. Lovin has been employed as an automobile assembler/rubber goods inspector. (*Id.*).

## III.   RELEVANT MEDICAL EVIDENCE

**2012 MS Diagnosis.** On September 4, 2012, Mr. Lovin was admitted to University Hospitals, presenting with a history of lightheadedness, unsteady gait, and facial numbness. (Tr. 346, 356). He had experienced these symptoms for three weeks prior, along with nausea and vomiting two days prior to arriving at the hospital. (Tr. 346). An MRI of Mr. Lovin's brain was ordered. (Tr. 356). The MRI showed "multiple areas of abnormal signal intensity predominantly involving the white matter and also white matter lesions involving his left parietal lobe . . . consistent with a demyelinating process." (Tr. 346). Mr. Lovin was diagnosed with possible MS. (*Id.*). The diagnosis was later confirmed as "relapsing and remitting multiple sclerosis." (Tr. 382).[4]

---

[4]    Relapsing-remitting MS is characterized by clearly defined attacks of new or increasing neurologic symptoms. *National Multiple Sclerosis Society, Relapsing-remitting MS (RRMS),* https://www.nationalmssociety.org/What-is-MS/Types-of-MS/Relapsing-remitting-MS (last accessed March 7, 2022). Relapses are followed by remission periods of partial or complete recovery; during remission, all symptoms may disappear, or else some symptoms may remain and become permanent. *Id.* Most common symptoms of relapsing-remitting MS include episodes of fatigue, numbness, vision problems, spasticity or stiffness, bowel and bladder problems, and cognition problems. *Id.*

Mr. Lovin received treatment from Gary Huston, M.D., who instructed him that he is unable to drive or go back to work, as there was risk of being injured on the job. (Tr. 354, 373). On September 4, 2012, Mr. Lovin was discharged in "fair" condition, still with gait disturbance, dizziness, finger weakness, and vision disturbances. (Tr. 373). He was discharged to his mother's home with prescriptions for nausea, insomnia, and a tapering dose of steroids. (Tr. 354-55). Mr. Lovin also received a prescription for physical therapy and occupational therapy for gait and balance training, muscle weakness in his fingers, and vision disturbance. (Tr. 355).

The discharge summary by Bashar Katirji, M.D., noted that Mr. Lovin had persistent numbness and intermittent gait instability. (Tr. 346). Motor exam showed 5/5 in all four extremities, but also showed an unsteady gait and his body swayed to one side. (*Id.*).

**University Hospitals.** Following his MS diagnosis, Mr. Lovin received treatment at University Hospitals, including from Edward Westbrook, M.D.,  Michael Devereaux, M.D. (Tr. 376, 792-96). Notes from November 7, 2012 confirm Mr. Lovin's continued difficulty walking and unsteadiness on his feet, despite an initial positive response to steroid treatment. (Tr. 376). These notes indicate it would be hazardous for Mr. Lovin to work on machinery, stating: "it would be a dangerous situation if he were to become extremely tired and lose his ability to function and hence, he cannot go back to work safely until he is better than he is now." (*Id.*).

Mr. Lovin was "significantly improved" by February 2013 and had returned to work. (Tr. 386, 787-89). He was taking Avonex[5] for his MS. (*Id.*). Mr. Lovin was experiencing side effects from the Avonex pen, and Dr. Devereaux wished to start him on Tecfidera, an oral medication. (Tr.

---

[5]     Avonex (interferon beta-1a) is an injection-based medication approved by the FDA to treat relapsing forms of MS. *National MS Society*, *Avonex* https://www.nationalmssociety.org/ Treating-MS/Medications/Avonex (last accessed March 7, 2021).

388). Dr. Devereaux indicated symptoms of fatigue, a common complaint in patients with MS. (Tr. 386). Mr. Lovin's neurologic examination was otherwise generally normal, with normal mental status findings, symmetrical power and tone (although his right abductor pollicis brevis muscle appeared slightly weaker than the left), and normal coordination, gait, and sensation. (Tr. 387-88).

Dr. Devereaux started Mr. Lovin on Tecfidera[6] in June 2013. (Tr. 382). Mr. Lovin took this medication through January 2014, at which time his insurance company changed and his prescription was not refilled. (*Id.*). Notes show Mr. Lovin had difficulty receiving treatment for his MS at times, even with insurance. (Tr. 376-77, 379, 382, 384). Even if procedures were covered, they would often come with significant costs, limiting the care he received. (*See, e.g.* Tr. 376: "His insurance covers his scans poorly. Ideally, I would like to see another scan, but he is left with a $2000 bill for the one that was done in August."). Dr. Devereaux noted nocturnal paresthesia in both hands, suspicious for carpal tunnel syndrome; after a period, the paresthesia dissipated and there were no other clinical signs suggesting carpal tunnel syndrome, indicating it may have been related to Mr. Lovin's employment. (382-83).

On March 12, 2014, Mr. Lovin received treatment at University Hospitals by Charles Lanzieri, M.D., including another brain MRI. (Tr. 348). This MRI showed an increased number of demyelinating foci in the right cerebral hemisphere. (*Id.*). Some of the previously abnormal white matter signal foci had decreased in size. (*Id.*).

---

[6]     Tecfidera (dimethyl fumarate) is an oral medication approved by the FDA to treat relapsing forms of MS. *National Multiple Sclerosis Society*, *Tecfidera*, https://www.national mssociety.org/Treating-MS/Medications/Tecfidera%E2%84%A2 (last accessed March 7, 2022).

On January 18, 2019, Mr. Lovin presented to the emergency room after screwing a drywall screw into his left hand. (Tr. 546-48, 642-44). The screw was removed, and Mr. Lovin was discharged. (Tr. 547).

**Ashtabula County Medical Center.** On December 29, 2016, Mr. Lovin visited the Ashtabula County Medical Center complaining of an MS flare up. (Tr. 595). He reported that when he has an MS flare up, he gets dizzy and was advised to sleep it off. (*Id.*). Mr. Lovin complained of fatigue, although the dizziness had resolved. (Tr. 596).

Mr. Lovin presented to the Ashtabula County Medical Center for MS symptoms on January 3, 2017, and received treatment from Elaina Williams, D.O. (Tr. 588). Mr. Lovin reported he had been stable on his Tecfidera but had not followed up with a neurologist for approximately three years, because Dr. Devereaux had retired. (*Id.*). He complained of "feeling weird" the previous week and had called off work. (*Id.*). Mr. Lovin admitted to feeling feverish, chills, and weakness, which he feared was an MS attack. (*Id.*). These symptoms had resolved by the visit with Dr. Williams. (*Id.*). Mr. Lovin admitted to a decrease in performance at work, and was calling off or arriving late due to symptoms. (*Id.*).

Mr. Lovin began treating his MS with Stephen Selkirk, M.D., at the Ashtabula County Medical Center. (*See* Tr. 406). Dr. Selkirk noted Mr. Lovin's treatment history, including past injection medication and current oral Tecfidera, started three years previous. (*Id.*). At this visit, Mr. Lovin reported smoking marijuana for his vertigo and nausea, and that he feels sick if he does not use marijuana, although he was clean at the time. (*Id.*). Mr. Lovin reported having no other exacerbations since his diagnosis of MS, but did report "bad headaches" and "sweating and puking" at times. (*Id.*).

11

At a visit on October 3, 2017, Mr. Lovin reported he was fired from his job. (Tr. 413). Mr. Lovin reported leg weakness, urinary urgency, stomach pains, diarrhea, and nausea. (*Id.*). He reported tiredness, lack of energy, and numbness and tingling in his fingertips and toes. (*Id.*). Mr. Lovin experienced worsening depression after he lost his antidepressant coverage when his insurance was cancelled. (*Id.*). Mr. Lovin also reported a pain level of six out of ten at this visit. (Tr. 416).

Mr. Lovin experienced a fall on October 6, 2017. (Tr. 466-69, 571-85). He exhibited right knee joint pain, tenderness, and edema. (Tr. 467-68). There was no fracturing. (Tr. 615-16). He had full range of motion of his knee on October 20, 2017. (Tr. 470).

On October 20, 2017, Mr. Lovin presented to Ashtabula County Medical Center requesting a referral to a neurologist. (Tr. 470, 571).

On January 10, 2018, Mr. Lovin underwent an initial psychiatric evaluation with Samar El Sayegh, M.D. (Tr. 473-77, 604-08). At this visit, Mr. Lovin reported he was unsure of which symptoms were related to MS and which were not; he reported fatigue, hand numbness, dizziness, being off-balance, and sweating. (Tr. 473). Mr. Lovin explained that he had used vacation days to "hang on" to his job, but was let go in July 2017 due to calling off. (*Id.*). Dr. Sayegh's notes indicate Mr. Lovin believed the visit was related to his MS and he was seeking neurological, not psychiatric, care. (Tr. 474). Dr. Sayegh's office linked Mr. Lovin to the Mellen Center so he might receive extensive specialized care for his MS and scheduled an appointment for January 24, 2017. (Tr. 475-76).

**Cleveland Clinic.** Mr. Lovin was seen for a psychological evaluation by Rachel Galioto, Ph.D., on May 22, 2018. (Tr. 679). Dr. Galioto indicated MRI's in 2012 confirmed Mr. Lovin's

MS diagnosis, and a 2014 MRI showed a decrease in size of the left periventricular white matter lesion, several new lesions, and no active lesions. (*Id.*). Dr. Galioto recorded Mr. Lovin's current symptoms, including severe fatigue, bilateral hand numbness, body aches, poor vision, weakness in his legs, fingers, and hands, back pain, lack of coordination in his hands, night sweats, bladder symptoms, and stomach pains. (*Id.*). During the interview, Mr. Lovin reported significant depression and cognitive issues, including difficulty focusing and forgetfulness. (*Id.*). Mr. Lovin's activities of daily living were intact. (*Id.*). Mr. Lovin endorsed difficulty falling asleep and waking up, and described constant fatigue. (Tr. 680).

Mr. Lovin was able to ambulate effectively and appeared steady with no movement abnormalities observed. (*Id.*). Dr. Galioto's evaluation indicated patterns "typically associated with marked distress and severe impairment in functioning." (*Id.*). Dr. Galioto stated "the most notable aspect of his presentation and report is marked psychological distress, which is likely impacting both his performance on cognitive testing and experience of cognitive difficulties." (Tr. 681). Dr. Galioto emphasized that Mr. Lovin endorsed severely elevated symptoms despite pharmacological treatment. (*Id.*). Dr. Galioto recommended considering more intensive treatment, such as a partial hospitalization program and the addition of behavioral treatment and a consult with social work. (*Id.*). Dr. Galioto indicated Mr. Lovin's symptoms were "clearly suboptimally treated" and referred him to psychology for continued treatment. (Tr. 682).

Mr. Lovin had an MRI on November 14, 2018. (Tr. 666-76). The MRI showed multiple intracranial white matter lesions compatible with MS. (Tr. 671). There was one new enhancing lesion of 1.5 x 1.2 cm in the left occipital lobe. (Tr. 668). Results from the MRI also showed disc

bulging at C4-C5 and disc protrusion at C6-C7 causing moderate right neural foraminal stenosis. (Tr. 670).

**Mellen Center.** Mr. Lovin received treatment for his MS at the Mellen Center with Desiree Chizmadia, APRN, CNP and Mary Rensel, M.D. (*See* Tr. 684-96, 723-28, 814-65). Mr. Lovin noted difficulty driving due to MS symptoms; he used a transportation company to attend his intake appointment at the Mellen Center. (Tr. 723, 725).

Dr. Rensel performed Mr. Lovin's intake on April 23, 2018. (Tr. 722-28). Dr. Rensel noted Mr. Lovin had been on Tecfidera for over 5 years but was not sure if it was helping his symptoms. (Tr. 723). Mr. Lovin described his hands as "always numb" and had been evaluated for carpal tunnel syndrome, but it was likely his MS causing the numbness. (*Id.*). Mr. Lovin endorsed multiple symptoms: bilateral numbness in feet and hands, depression (treated by a psychiatrist and social worker); body aches; bad vision; forgetfulness; constant weakness in legs, fingers, and hands; back pain; incoordination of hands; night sweats; nocturia and bladder symptoms; andstomach pains. (Tr. 723-24).

Coordination testing in the arms and legs noted signs of cerebellar dysfunction and dysmetria or ataxia (lack of coordination). (Tr. 726). Mr. Lovin's gait was stable and independent but he had difficulty with his tandem gait. (*Id.*).

Dr. Rensel confirmed Mr. Lovin's MS diagnosis through MRI of his brain, and indicated he had years of relapsing neurologic symptoms. (Tr. 727). Dr. Rensel assessed Mr. Lovin's neurologic examination as "significant" for his flat affect, weakness in his right leg, incoordination of both hands, and ataxia or imbalance. (*Id.*). Dr. Rensel assessed Mr. Lovin's MS as "clinically worsening" despite treatment with Tecfidera. (*Id.*). Dr. Rensel indicated the MS symptoms to be

14

addressed, included depression, weakness, incoordination, fatigue, cognitive deficits, gait disorder, and inability to work. (*Id.*).

Dr. Rensel ordered additional testing, including an updated MRI. (Tr. 727, 732-36). She referred Mr. Lovin to physical and occupational therapy, as well as psychiatric care and PCP for care of MS co-morbidities. (Tr. 728). The occupational therapy evaluation on May 14, 2018 indicated Mr. Lovin had increasing symptoms and difficulty with home management tasks. (Tr. 699). Notes indicated Mr. Lovin owned a cane. (Tr. 703). Mr. Lovin underwent a physical therapy evaluation on May 8, 2018. (Tr. 707-20). Notes indicated Mr. Lovin had decreased strength and balance, complaints of pain and dizziness, and a history of fall with injury. (Tr. 707). Notes indicated benefit from continued physical therapy treatment to improve Mr. Lovin's safe, functional mobility. (*Id.*).

On January 2, 2019, Nurse Chizmadia noted Mr. Lovin had not missed any Tecfidera doses but may run out of medication in the next few days. (Tr. 685). Mr. Lovin reported cognition problems and difficulty processing written material, conversations, and difficulty word finding. (*Id. see also* Tr. 819-20). Mr. Lovin endorsed moderate fatigue, and pain and paresthesias in bilateral hands and feet. (Tr. 686, 688, 820).

Nurse Chizmadia indicated Mr. Lovin required a change in treatment, as he had breakthrough disease while on Tecfidera. (Tr. 688, 822). Nurse Chizmadia discussed treatment options, and Mr. Lovin agreed to begin Ocrevus[7] infusion treatments. (*Id.*). Pre-Ocrevus labs were

---

[7]   Ocrevus is a monoclonal antibody treatment, approved by the FDA for the treatment of relapsing forms of MS in adults. *National Multiple Sclerosis Society*, *Ocrevus*, https:// www.nationalmssociety.org/Treating-MS/Medications/Ocrevus (last accessed March 8, 2022). It is administered via intravenous infusions. *Id.*

obtained. (*Id.*). An Ocrevus startup checklist was completed. (Tr. 697-98). Nurse Chizmadia indicated Mr. Lovin's cognitive difficulties can also be attributed to his underlying depression. (*Id.*).

On February 6, 2019, Mr. Lovin was approved for Ocrevus infusion treatment. (Tr. 818-19). Dr. Rensel ordered the Ocrevus treatments and informed Mr. Lovin the office would reach out to schedule treatments. (*Id.*). She informed Mr. Lovin he would need a driver for Ocrevus infusion days and would likely feel tired for the 24 hours following infusion treatments. (Tr. 819). He was informed he needed to stop his Tecfidera medication one week prior to Ocrevus infusion treatments. (*Id.*).

On February 21, 2019, Mr. Lovin called the Mellen Center and indicated he did not wish to begin Ocrevus treatment and inquired as to other treatment options. (Tr. 818). He was recommended to make an appointment to discuss treatment options. (*Id.*).

On October 1, 2019, Mr. Lovin presented to the Mellen Center with normal gait and without the need for an assistive device. (Tr. 814-17). Nurse Chizmadia noted he was approved for the Ocrevus infusion treatment, but had not scheduled the infusions. (*Id.*). She stated he needed to start treatments as soon as he was able, due to the enhancing lesions on the most recent MRI and his continued neurological symptoms. (*Id.*). She re-placed the referral for Ocrevus and re-ordered pre-Ocrevus labs. (*Id.*).

**Glenbeigh.** On April 12, 2017, Mr. Lovin was admitted to an inpatient detox program at Glenbeigh, presenting with cannabis and amphetamine use disorders and withdrawal. (Tr. 392). On admission, Mr. Lovin was also complaining of symptoms including insomnia, restlessness/ anxiety, and fatigue. (*Id.*). Mr. Lovin's physical examination was otherwise normal, including

normal gait and sensation. (Tr. 394). His mental status examination was unremarkable, but with fair insight and judgment. (Tr. 399). However, Mr. Lovin experienced difficulty focusing during the interview, was often tangential, and was somewhat difficult to redirect. (Tr. 396).

Mr. Lovin passed all weekly drug screenings. (Tr. 744). He was active and participatory in group discussions. (*Id.*). He was recommended for discharge with staff approval. (*Id.*). Mr. Lovin was monitored for symptoms of withdrawal, and was stable upon discharge. (Tr. 400). He was recommended to continue outpatient care, to select a sponsor, and attend 3-4 Alcoholics Anonymous/Narcotics Anonymous meetings while in aftercare. (Tr. 744).

**Signature Health.** Beginning in October 2017, Mr. Lovin received behavioral health treatment at Signature Health for anxiety and mood disorders, and secondary cannabis abuse,. (*See, e.g.*, Tr. 426-31). His provider, Donna Colucci, CNP, LSW, also noted physical symptoms such as numbness and tingling, and weakness from MS. (Tr. 485).

On October 25, 2017, Mr. Lovin endorsed racing thoughts, mood swings, anxiety, nervousness, and erratic sleep. (Tr. 433). His provider noted an anxious and depressed affect, verbose speech, and fair hygiene. (Tr. 441). Mr. Lovin exhibited unsteady and uncoordinated motor activity. (*Id.*).

Treatment notes from October 26, 2017 indicate Mr. Lovin had depression and anxiety with a congruent affect, and decreased focus and concentration. (Tr. 448). He had poor eye contact and fair grooming and attitude. (*Id.*). His associations were loose at times. (Tr. 449). He had poor short- and long-term memory, and poor judgment and insight. (*Id.*). Mr. Lovin was started on Viibryd (an antidepressant). (Tr. 450).

At a November 7, 2017 appointment, Mr. Lovin reported continued depression and anxiety, despite attending counseling sessions. (Tr. 430). He reported some improvement from taking Viibryd. (*Id.*). Mr. Lovin endorsed fatigue and emotional outbursts, likely related to his MS. (*Id.*). Mr. Lovin reported experiencing increased pain and dizziness. (*Id.*). Mr. Lovin exhibited racing thoughts, loose associations, poor short-term and long-term memory, and poor judgment and insight. (Tr. 429).

On December 5, 2017, Nurse Colucci noted decreased muscle strength and tone and an unsteady gait. (Tr. 486). Mr. Lovin exhibited decreased focus and concentration, depressed and anxious mood, and racing and confused thoughts. (Tr. 486). Mr. Lovin demonstrated poor short-term memory and fair long-term memory, with poor judgment and insight. (Tr. 486). Nurse Colucci noted Mr. Lovin had increased pain and dizziness, with anger, mood swings, and mumbling to himself. (Tr. 488). Mr. Lovin exhibited largely similar symptoms at his January 12 and February 23, 2018 visits. (Tr. 490-501).

On March 9, 2018, Mr. Lovin demonstrated normal muscle strength and tone, and steady gait. (Tr. 504). His attention was decreased, with confusing and low speech. (*Id.*). His short-term and long-term memory was fair, with poor judgment and insight. (Tr. 505). Nurse Colucci reported he was less confused in his responses and was compliant with his medication. (Tr. 506). Mr. Lovin reported fatigue and mood swings. (*Id.*).

On April 3, 2018, Nurse Colucci indicated Mr. Lovin had decreased muscle strength and tone with steady gait. (Tr. 510). Mr. Lovin had decreased attention and concentration, a depressed and anxious mood and affect, and racing thoughts. (*Id.*). He had fair short- and long-term memory and poor judgment and insight. (Tr. 511). Nurse Colucci recorded similar symptoms at Mr.

Lovin's visits on May 1 and June 7, 2018. (Tr. 514-25). Mr. Lovin reported continued tiredness. (Tr. 518, 524).

On October 31, 2018, Mr. Lovin reported he had stopped taking his antidepressant for the previous two months as he was unsure if it was helping his symptoms, but wished to go back on it. (Tr. 530). At this visit, Mr. Lovin had fair grooming, attitude, and eye contact, a depressed and anxious mood, racing thoughts, and coherent speech. (Tr. 528). He had poor judgment, fair insight, and fair short- and long-term memory. (Tr. 529).

In subsequent sessions, Mr. Lovin exhibited similar symptoms. (Tr. 534-35, 654-55). On December 11, 2018, he reported having visited the Mellen Center and completed testing for his MS, but had not received results yet. (Tr. 536). Nurse Colucci noted Mr. Lovin was difficult to follow in conversation because he was focused on multiple topics and he had difficulty staying on task. (*Id.*). Nurse Colucci noted similar difficulty staying on task at his visits on January 30 and March 7, 2019, despite compliance with his antidepressant and reported improvement. (Tr. 542, 656).

On April 2 and 30, 2019, Mr. Lovin had decreased attention and concentration, racing thoughts, poor memory, poor judgment and insight. (Tr. 747-52, 755-56). He had a depressed and anxious mood with a congruent affect, with racing thoughts, decreased focus and concentration. (Tr. 749-50). Mr. Lovin exhibited decreased muscle tone, but steady gait. (Tr. 747-52, 755). Nurse Colucci noted Mr. Lovin was difficult to follow in conversation because he speaks very fast, has difficulty staying on task, and forgets what he is talking about. (Tr. 751, 758). At the April 2nd visit, Mr. Lovin related to Nurse Colucci that he had opted not to take the MS infusion treatment, as he was worried about its side effects. (Tr. 757). On April 30, 2019, Mr. Lovin related that he

had opted not to take the MS treatment before, but has been experiencing increased symptoms and planned to return to the Mellen Center. (Tr. 751).

Mr. Lovin's appointments on May 28, June 25, July 30, and September 5, 2019 noted similar symptoms of decreased muscle strength and tone, decreased attention and concentration, racing thoughts, poor or fair memory, and poor or fair judgment and insight. (Tr. 760-63, 766-71, 772-777, 779-81). His gait was unsteady on June 25. (Tr. 774). Nurse Colucci recorded that Mr. Lovin contacted the Mellen Center to be seen as soon as possible, as he felt his MS was getting worse. (Tr. 764, 770, 776, 782).

## IV. MEDICAL AND ADDITIONAL OPINIONS

**Dr. Ackley.** On January 20, 2018, Mr. Lovin underwent a disability examination by Freeland Ackley, M.D. (Tr. 455-464). Mr. Lovin alleged his limitations included sitting for 30 minutes, standing for 30 minutes, walking one mile, and lifting eight pounds. (Tr. 456). Mr. Lovin was alert and had appropriate eye contact during the neurological examination. (Tr. 457). His memory and concentration were normal. (*Id.*). Dr. Ackley observed no balance problems. (Tr. 458). Mr. Lovin had a normal, reciprocal gait pattern without an assistive device. (*Id.*). Dr. Ackley also observed abnormal tandem walking but negative Romberg test. (*Id.*). Mr. Lovin's sensory examination was normal to light touch and he exhibited symmetric reflexes. (*Id.*). Mr. Lovin was able to lift, carry, and handle light objects, and could squat and rise with ease. (*Id.*). Mr. Lovin's fine motor coordination and handling was normal. (Tr. 459). Dr. Ackley reported Mr. Lovin's MS seemed well-controlled on his current medications with no acute symptoms to suggest otherwise. (*Id.*). Dr. Ackley assessed Mr. Lovin as able to walk for 60 minutes, stand for 60 minutes, sit for more than an hour at a time, and lift over 20 pounds. (*Id.*).

Dr. Ackley completed manual muscle testing, showing Mr. Lovin had normal range of motion, normal grasp, pinch, and fine coordination. (Tr. 461-64). Dr. Ackley reported Mr. Lovin was "able to do" tasks such as pick up a coin, write, button/unbutton, etc. (Tr. 462). Mr. Lovin exhibited no muscle atrophy. (*Id.*).

**State Agency Opinions.** Dmitri Teague, M.D., a state agency physician, reviewed Mr. Lovin's initial application and found that his MS was a severe impairment. (Tr. 97-107). Dr. Teague found Mr. Lovin could occasionally lift and carry up to 20 pounds and 10 pounds frequently. (Tr. 104-05). Dr. Teague indicated Mr. Lovin could stand/walk or sit up to six hours in an eight-hour workday (Tr. 105). Dr. Teague stated Mr. Lovin could never climb ladders, ropes, or scaffolds, but could frequently climb ramps or stairs, and could frequently balance, stoop, kneel, crouch, and crawl. (Tr. 106-07). Dr. Teague noted Mr. Lovin should avoid concentrated exposure to extreme hot and extreme cold temperatures and work hazards. (Tr. 106).

On January 29, 2018, Paul Tangeman, Ph.D., a state agency psychologist, reviewed the medical evidence and concluded Mr. Lovin had severe mental impairments due to depression and anxiety. (Tr. 97-109). Dr. Tangeman indicated Mr. Lovin had limitations in concentration and persistence, but no limitations in understanding and memory. (Tr. 108). Dr. Tangeman indicated Mr. Lovin would have difficulty managing his stress, but that he could understand, remember, and follow two- to three-step tasks in a relaxed, static setting. (Tr. 107-08). Dr. Tangeman explained that Mr. Lovin's symptoms would be exacerbated by perceived stressors, but that he could adapt to routine, predictable duties with changes that are well-explained and introduced slowly. (Tr. 108-09).

At the initial level, Mr. Lovin was found able to perform light work and therefore determined not disabled. (Tr. 110-11).

On May 4, 2018, Juliette Savitscus, Ph.D., a state agency psychologist, reviewed the medical evidence and affirmed Dr. Tangeman's opinion at the reconsideration level. (Tr. 114-25). On May 5, 2018, Leon Hughes, M.D., a state agency physician, reviewed the medical evidence at the reconsideration level and affirmed Dr. Teague's opinion. (Tr. 114-23).

On reconsideration, Mr. Lovin was found able to perform light work despite his limitations and therefore was determined not disabled. (Tr. 125-27).

**Matthew Sutliff.** Mr. Lovin was referred to Matthew Sutliff, PT, DPT, MSCS, at the Mellen Center for a Functional Capacity Evaluation to assess his vocational ability. (Tr. 646). Mr. Sutliff noted functional limitations from vertigo, gait instability, lower extremity weakness, visual impairment, left hand numbness, heat intolerance, nausea, vomiting, and depression. (*Id.*). Mr. Sutliff noted Mr. Lovin had a cane at home. (*Id.*). Mr. Lovin had an exercise program of pushups, sit-ups, and walking his dog. (*Id.*). Mr. Sutliff noted poor short- and long-term memory. (Tr. 647). Notes also indicate urinary and bowel urgency. (*Id.*). Mr. Lovin indicated he was not confident on ladders and felt unsafe at elevated heights. (*Id.*).

Physical testing indicated Mr. Lovin was able to stand without using hands for stabilization and could ambulate effectively without the use of an assistive device. (Tr. 648). He could sit safely with minimal use of his hands. (*Id.*). Mr. Lovin was able to ambulate independently, and his gait deviations were within normal limits. (Tr. 649). Mr. Sutliff also indicated a diagnosis of difficulty walking in addition to MS. (Tr. 650).

Based on testing criteria, Mr. Sutliff concluded that Mr. Lovin was unable to perform his previous job. (*Id.*). However, Mr. Lovin was qualified to work full-time according to DOT classification of light physical demands. (*Id.*).

**Donna Colucci, NP-C.** Nurse Colucci completed an Off-Task/Absenteeism Questionnaire on February 26, 2019. (Tr. 805-07). In this questionnaire, Nurse Colucci indicated Mr. Lovin would likely be off-task at least 20 percent of the time (exclusive of breaks). (Tr. 805). Nurse Colucci based this assessment on Mr. Lovin's MS, his underlying physical or mental impairments, established through objective findings, and his inability to concentrate, pay attention, and/or focus on a sustained basis. (*Id.*). She estimated Mr. Lovin would be absent about four times per month. (*Id.*).

**Desiree Chizmadia.** Nurse Chizmadia completed a medical source statement on July 12, 2019. (Tr. 810-12). In it, she indicated Mr. Lovin did not medically require a hand-held assistive device for walking or standing. (Tr. 810).

## The ALJ's Decision

The ALJ's decision, dated November 1, 2019, included the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.   The claimant has not engaged in substantial gainful activity since July 7, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.   The claimant has the following severe impairments: multiple sclerosis, depressive disorder, anxiety disorder, and marijuana abuse (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 404.1545) to perform light work as defined in 20 CFR 404.1567(b), except for the following additional limitations: the claimant can occasionally balance, stoop, kneel, crouch, and crawl; he cannot tolerate concentrated exposure to temperature extremes; and mentally, he can perform routine tasks in a low-stress environment (no fast pace, strict quotas, or frequent duty changes) involving superficial interpersonal interactions (no arbitration, negotiation, or confrontation) (20 CFR 404.1569a).

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on October 30, 1979 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from July 7, 2017, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12-21).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an

25

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports

the ALJ's decision, the court must overturn when an agency does not observe its own procedures

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*,

378 F.3d 541, 546-47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a),

1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is

disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Mr. Lovin presents two issues for this Court's review:

- Whether the ALJ's decision that Mr. Lovin's impairment does not meet or equal Listing 11.09 is supported by substantial evidence; and

- Whether the ALJ's decision that Mr. Lovin can perform light work is supported by substantial evidence when he failed to properly analyze Mr. Lovin's complaints pursuant to SSR 16-3p.

(Pl.'s Br., ECF #13, PageID 962). The Commissioner opposes both issues and asserts the ALJ's decision was supported by substantial evidence. (Comm'r's Br., ECF #15, PageID 991-95). On review and for the reasons that follow, I find the ALJ's decision not supported by substantial evidence and recommend the District Court reverse.

**I.    The ALJ's decision that Mr. Lovin's impairment does not meet or equal Listing 11.09 is not supported by substantial evidence.**

Mr. Lovin argues the ALJ's determination at Step Three—that the MS symptoms Mr. Lovin experienced did not meet or equal the criteria in Listing 11.09—was not supported by substantial evidence. (Pl.'s Br., ECF #13, PageID 974-75). In support, Mr. Lovin points to the fact that the ALJ provided no discussion beyond a simple statement that his physical symptoms did not reach the requisite severity to satisfy the Listing, despite indicating further discussion would follow. (*Id.*). The Commissioner opposes, stating correctly that the claimant bears the burden to demonstrate

27

disability at Step Three and that the ALJ's decision was supported by substantial evidence. (Comm'r's Br., ECF #15, PageID 991-95).

### A. Listing 11.09 Analysis

At Step Three, an ALJ must determine whether the claimant's impairment meets or equals a listed disorder. 20 C.F.R. § 1520(d)(2)). In so doing, an ALJ compares the medical evidence against the requirements contained in the relevant listing. *May v. Astrue*, No. 4:10CV1533, 2011 WL 3490186, at *7 (N.D. Ohio June 1, 2011). If a claimant meets or equals a Listing, then the claimant is considered disabled and the analysis does not continue to the following steps. 20 C.F.R. § 404.1525(a). However, at Step Three, claimants bear the burden of showing they meet or equal a listed impairment. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). Based on this burden of proof, remand is appropriate when the record raises a "substantial question" of whether a claimant meets a Listing. *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641-42 (6th Cir. 2013). Even so, there is no heightened articulation standard; substantial evidence review still governs this Court's review of the ALJ's findings. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

The Listing at issue here—Listing 11.09—covering multiple sclerosis, is met by the following:

11.09 Multiple sclerosis, characterized by A or B:

> A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities.
>
> OR
>
> B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:

28

> Understanding, remembering, or applying information (see 11.00G3b(i));
> Interacting with others (see 11.00G3b(ii)); or
> Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
> Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. Part 404, subpt. P, app. 1, § 11.09.

When evaluating MS, ALJs are directed to "consider whether [the claimant's] signs and symptoms are persistent or intermittent, how frequently they occur and how long they last, their intensity, and whether [the claimant has] periods of exacerbation and remission." 20 C.F.R. Part 404, subpt. P, app. 1, § 11.00. The ALJ is also directed to "consider the effectiveness of treatment in improving the signs, symptoms, and laboratory findings related to [the claimant's] neurological disorder, as well as any aspects of treatment that may interfere with [the claimant's] ability to function." *Id.*

In his analysis, the ALJ here states "the undersigned has considered listing 11.09, *Multiple sclerosis*. There was no evidence of the requisite disorganization of motor function in two extremities or a marked limitation in physical functioning, as discussed further below. The claimant lived" [*sic*]. (Tr. 13). The opinion stops mid-sentence, then in the following paragraph the ALJ offers a rote statement that he considered the opinions of the State agency medical consultants who evaluated the issue and reached the same conclusion. (*Id.*). The ALJ then moves on to a full analysis of Mr. Lovin's mental impairments under Listings 12.04 and 12.06. (Tr. 13-15).

This Court may look to the ALJ's decision in its entirety to justify the ALJ's Step Three analysis. *Snoke v. Astrue*, No. 2:10-CV-1178, 2012 WL 568986, at *6 (S.D. Ohio Feb. 22, 2012), (citing *Bledsoe*, 165 F. App'x at 411). But the ALJ's decision must contain "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Id.* Reading further into

the ALJ's decision does not cure his failure to analyze the issues found in the Listing 11.09 discussion. First, the ALJ's analysis of Mr. Lovin's mental impairments under Listings 12.04 and 12.06 may provide some insight into his analysis of any cognitive impairments contained in 11.09B's criteria, but it is only half the picture. It does not speak to Mr. Lovin's *physical* impairments as a result of his MS.

The ALJ does provide reference to Mr. Lovin's subjective complaints and his physical abilities in his Step Four discussion (*see* Tr. 15-18); however, absent more, the Step Four analysis of Mr. Lovin's credibility regarding subjective symptoms does not directly indicate whether Mr. Lovin's disorganization of motor function would satisfy the physical criteria of Listing 11.09. *Davis v. Comm'r of Soc. Sec. Admin.*, No. 5:12-CV-2577, 2013 WL 3884188, at *8 (N.D. Ohio July 26, 2013) (citation to evidence of motor dysfunction at Step Four without relation to Listing 11.09 can prevent a reviewing court from meaningfully determining whether Step Three criteria are met).

It is also not clear whether the ALJ properly analyzed "the effectiveness of treatment in improving the signs, symptoms, and laboratory findings" related to Mr. Lovin's MS, or "any aspects of treatment that may interfere with [his] ability to function." 20 C.F.R. Part 404, subpt. P, app. 1, § 11.09. For example, in his Step Four analysis, the ALJ appears to mischaracterize the medical record and implies that Mr. Lovin is able to function whether or not he receives treatment:

> [Mr. Lovin] did not follow with the Mellen Center again until October 2019, at which time he reported he was not currently taking Tecfidera, and had been approved for Ocrevus, but never scheduled infusions. Although he had essentially received no treatment for MS for 10 months, physical examination was relatively unremarkable, with normal strength, coordination, standing balance, and gait.

(Tr. 17).

30

The record does not support the presumption that just because Mr. Lovin had not visited the Mellen Center meant he had "essentially received no treatment" during that period. Rather, Mr. Lovin was instructed to continue taking his Tecfidera medication until one week prior to Ocrevus infusions. (Tr. 688, 814-17, 822). And, while it may be true that Mr. Lovin did not attend regular appointments at the Mellen Center, he did remain in contact by phone in the period between his January and October 2019 appointments. (Tr. 814-19).

Nor does it follow that the failure to take Ocrevus treatment would necessarily trigger certain physical examination findings. Notes show that Tecfidera was no longer sufficient to stop the progression of MS, and Mr. Lovin's 2018 MRI showed he had additional enhancing lesions. (Tr. 688). Nurse Chizmadia indicated Mr. Lovin should continue with his Tecfidera treatment but that Ocrevus treatment was necessary because he was experiencing breakthrough symptoms despite that treatment. (Tr. 688, 822). Signature Health notes from spring and summer 2019 record that Mr. Lovin was complaining of increased MS symptoms, and that he showed decreased muscle strength and tone, cognitive issues, and unsteady gait. (Tr. 760-63, 766-71, 772-777, 779-81).

This mischaracterization and dismissive treatment of Mr. Lovin's disease progression and ignoring of medical evidence of "clinically worsening" MS (Tr. 727), breakthrough disease despite Tecfidera treatment (Tr. 688, 727, 822), confirmed by MRI findings (Tr. 666-76), or consideration of the side effects of Ocrevus infusion treatment (Tr. 814-17), does not provide the requisite analysis to show the ALJ followed the regulations in his Listing 11.09 analysis.

### B. Longitudinal analysis under *Parish* and *Wilcox*

MS is an incurable, progressive disease, subject to on-again, off-again periods of remission and exacerbation. *Parish v. Califano*, 642 F.2d 188, 193 (6th Cir. 1981); *see also supra* n.4.

Relapsing-remitting MS is characterized by periods of neurologic attacks (relapses) followed by periods of partial or complete recovery (remissions). *Supra* n.4. Relapsing-remitting MS can be characterized as "active," with relapses showing evidence of new MRI activity, and also characterized as "worsening," showing a confirmed increase in disabling symptoms following a relapse. *Id.* The symptoms experienced during a relapse relate to inflammation in the central nervous system and can range from mild to severe, can produce one symptom or many, and can include symptoms such as vision problems, gait disturbance, extreme fatigue, and balance problems. *National Multiple Sclerosis Society*, *Managing Relapses*, https://www.nationalmssociety.org/Treating-MS/Managing-Relapses (last visited March 10, 2022). Relapses can be as short as 24 hours, but commonly last multiple days or weeks. *Id.* Remission does not mean full recovery—some symptoms during a relapse may become permanent; rather, remission indicates that there is no apparent progression of the disease. *Id.*

A diagnosis of MS is not a *per se* disabling condition under Agency regulations, so long as substantial evidence supports the ALJ's determination. *Jones v. Sec'y of Health & Hum. Servs.*, 35 F.3d 566 (6th Cir. 1994). Rather, an ALJ errs by placing undue reliance on a claimant's periods of remission. *See Parish*, 642 F.2d at 193. When evaluating MS or other episodic disease, the ALJ must consider "the frequency and duration of the exacerbations, the length of the remissions, and the evidence of any permanent disabilities." *Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990).

In addition, a claimant's ability to work during periods of remission may not serve as substantial evidence to support a finding of non-disability. *See Parish*, 642 F.2d at 193; *see also Wilcox*, 917 F.2d at 277. "The fact that plaintiff worked . . . is not necessarily substantial evidence of substantial gainful activity." *Wilcox*, 917 F.2d at 277 (quoting *Parish*, 642 F.2d at 192).

Furthermore, Mr. Lovin's fortitude in working during periods of remission should not be used against them in the disability analysis. *See Wilcox*, 917 F.2d at 277 ("Wilcox should not be penalized because he had the courage and determination to continue working despite his disabling condition.").

And, while the ALJ in this case  cites evidence that may satisfy the substantial evidence standard, substantial evidence also includes that evidence that "fairly detracts from its weight," *Brooks*, 531 F. App'x at 641, particularly in the context of episodic diseases such as MS. The failure to adequately discuss medical evidence showing the periodic effects of Mr. Lovin's disability demonstrates the type of overreliance on periods of remission cautioned by the Sixth Circuit in *Parish* and *Wilcox*.

The ALJ describes Mr. Lovin's symptoms as follows:

[Mr. Lovin] reported severe fatigue, bilateral hand numbness, body aches, poor vision, weakness in his legs, fingers, and hands, back pain, incoordination of his hands, night sweats, bladder symptoms, and stomach pains. He also reported significant depression and cognitive issues. [Mr. Lovin] alleged that he lost his long-time job at a rubber manufacturer in July 2017 due to absenteeism caused by fatigue, dizziness, and balance issues related to his MS. He alleged that he continues to experience decreased energy, back and hand pain, and leg weakness resulting in falls. Since the onset date, the claimant also alleged that he has also experienced depression and anxiety symptoms, including cognitive decline.

(Tr. 15). The ALJ then reasons:

[Mr. Lovin's] allegations of disabling physical limitations are not fully consistent with the objective evidence and treatment history. . . . Since the alleged onset in July 2017, the claimant's treatment for his physical symptoms has been routine in nature, and relatively sporadic in frequency, and is inconsistent with the debilitating symptoms he has currently alleged. There was no evidence of a significant relapse of his MS symptoms at the time he stopped working.

(Tr. 16). In support, ALJ cites and discusses Mr. Lovin's self-reported activities of daily living, medical evidence showing Mr. Lovin's normal gait and balance, and otherwise normal

33

examinations, MRI findings, and opinion evidence showing Mr. Lovin does not require a cane to ambulate and may be able to perform light exertional activities. (*See* Tr. 15-19).

On its own, the evidence cited by the ALJ may satisfy the substantial evidence standard. However, reviewing the record as a whole, the ALJ does not fully acknowledge those portions of the record where Mr. Lovin may be experiencing an exacerbation and the medical evidence supports the disabling nature of Mr. Lovin's condition. I note, for example, the ALJ makes no reference to Dr. Rensel's notes from the Mellen Center, other than to say "the physician ordered an updated MRI and lab work, as well as suggesting continuing to manage depressive symptoms through Signature Heath." (Tr. 16-17). In that portion of the record, Dr. Rensel notes that Mr. Lovin demonstrated signs of cerebellar dysfunction, lack of coordination, and had difficulty with his tandem gait. (Tr. 726). She also noted he had years of relapsing neurological symptoms and assessed him as having "clinically worsening" MS—even though he was treating with Tecfidera. (Tr. 727). Dr. Rensel found these conditions "significant," citing Mr. Lovin's flat affect, weakness in his right leg, incoordination of both hands, and ataxia or imbalance. (*Id.*). Dr. Rensel indicated Mr. Lovin's MS symptoms to be addressed included: depression, weakness, incoordination, fatigue, cognitive deficits, gait disorder, and inability to work. (*Id.*).

The ALJ also references a May 2018 referral to physical therapy "for evaluation of mildly decreased lower extremity strength and slightly decreased balance" (Tr. 17), but ultimately finds Mr. Lovin's "daily functioning is inconsistent with disabling physical limitations." (*Id.*). However, in the physical therapy evaluation Mr. Lovin, "present[ed] with a diagnosis of gait abnormality" and "has the following limitations in activities and participation: challenges to learn and apply knowledge, impairment in tasks and activities of daily living, impaired communication, impaired

34

cognition, impaired mobility, impaired self care . . . impaired major life areas of work and leisure." (Tr. 707). The therapist also indicated that Mr. Lovin's "clinical presentation is evolving." (*Id.*). And occupational therapy reports from the same period also state that "[Mr.] Lovin present[ed] with the diagnosis of multiple sclerosis with increasing symptoms and difficulty with all home management tasks." (Tr. 699).

Finally, I note that, although subjective symptom statements do not transform into medical evidence by mere incorporation into a medical record, *see Roberts v. Comm'r of Soc. Sec.*, No. 1:14-CV-355, 2015 WL 3936177, at *4 (W.D. Mich. June 26, 2015), Mr. Lovin is consistent in his complaints of exacerbation of MS symptoms including extreme fatigue, bilateral hand numbness, periodic unsteady gait, upset stomach, heat intolerance, and cognitive impairments. (*See, e.g.*, Tr. 413, 686, 688, 723-24, 820). He is consistent in these complaints across providers. (*See, e.g.*, Tr. 473, 679-80). Although the intermittent nature of his MS symptoms may make it difficult to confirm in a periodic clinical appointment with an MS provider, his symptoms have been observed by his behavioral health provider in his regular appointments. (Tr. 441, 486-88, 490-501, 514-23, 747-52, 755, 774).

The failure of the ALJ to provide a discussion of counterbalancing evidence to show periodic exacerbation of Mr. Lovin's MS is insufficient to meet the analysis necessary under *Parish* and *Wilcox*. This, coupled with the omissions in the Listing 11.09 analysis at Step Three, prevents my meaningful review, even when reading the decision as a whole. Without deciding whether the evidence proffered by Mr. Lovin is sufficient to show his disability at Step Three, I find the ALJ has not provided a longitudinal analysis of Mr. Lovin's MS progression, and appears to rely on periods of relative ability without considering those periods where his performance was diminished

even if he may present on a "good day" in a clinical setting. Therefore, substantial evidence does not support his Step Three analysis and remand is necessary.

Because the errors at Step Three are determinative of Mr. Lovin's disability, I need not reach the asserted errors at Step Four.

On remand, I recommend the ALJ be directed to review Mr. Lovin's DIB claim anew to determine whether he was disabled under the five-step sequential evaluation, including a longitudinal re-consideration of the evidence and reevaluation at Step Three consistent with the analysis described above. If necessary based on the Step Three result, I further recommend a re-assessment of his RFC, re-analysis at Steps Four and Five, and consideration of testimony from a medical expert regarding the progressing nature of relapsing-remitting MS.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying DIB not supported by substantial evidence and recommend the decision be **REVERSED** and the matter remanded for further proceedings as outlined above.

Dated: March 11, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

36

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).